**Michael McCRAY, Petitioner-Appellee,**

v.

**Robert ABRAMS, Respondent-Appellant.**

**No. 1272, Docket 84–2026.**

United States Court of Appeals,
Second Circuit.

Argued May 22, 1984.

Decided Dec. 4, 1984.

Meskill, Circuit Judge, filed dissenting opinion.

**1114**

Steven R. Shapiro, New York Civil Liberties Union, New York City, for petitioner-appellee.

Barbara D. Underwood, Asst. Dist. Atty., Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., Kings County, Allan P. Root, Nikki Kowalski, Asst. Dist. Attys., Brooklyn, N.Y., on the brief), for respondent-appellant.

Before LUMBARD, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Respondent New York State Attorney General Robert Abrams (the "State") appeals from a judgment of the United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge,* granting the petition of Michael McCray, a black defendant convicted in New York State Supreme Court of robbery, for a writ of habeas corpus on the ground that the prosecution's use of peremptory challenges to excuse all black and Hispanic venirepersons from the jury that convicted McCray violated the impartial jury trial and equal protection provisions, respectively, of the Sixth and Fourteenth Amendments to the Constitution. *McCray v. Abrams,* 576 F.Supp. 1244 (E.D.N.Y.1983). The district court ordered the State to release McCray unless it afforded him a new trial within 60 days.[1] The court stayed its judgment pending this appeal.

On appeal, the State agrees that a discriminatory use of peremptory challenges would violate a defendant's fundamental rights. It contends, however, that the district court (1) erred in ruling that McCray made out a prima facie case that the prosecution so used its peremptory challenges in his case, and (2) if a prima facie case was established, erred in not holding an evidentiary hearing giving the State an opportunity to rebut the inference that it had exercised its peremptory challenges for a constitutionally forbidden purpose.

---

**1.** Although McCray has not been incarcerated since his conviction, but rather has been allowed, upon posting a bond, to remain at liberty pending the conclusion of the proceedings challenging his conviction, he is, by virtue of the limitations placed upon his freedom, in "custo- dy" within the meaning of the federal habeas corpus statute, 28 U.S.C. § 2254(a) (1982). *See Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963).

We hold that the district court properly concluded that McCray established a prima facie case that the State's use of peremptory challenges violated his Sixth Amendment right to trial by an impartial jury, and we affirm that portion of the court's ruling. We are persuaded, however, that the court should have held a hearing to give the State an opportunity to rebut the prima facie case, and we therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

On November 15, 1978, Philip Roberts, a white art student, was assaulted and robbed at gunpoint in downtown Brooklyn by three black youths. Roberts returned to his college dormitory and notified his resident adviser and the police. The police did not respond immediately, but on December 1 and 5, they took Roberts on a tour of the area. The first expedition did not produce an identification, but during the second, Roberts identified McCray, who was standing on a street corner near his home, as one of the robbers.

McCray was arrested and charged with robbery in the first and second degrees. The arrest was McCray's first.

### A. *The State Court Proceedings*

McCray's first trial was before a jury composed of nine whites and three blacks. The trial ended in a hung jury, with nine jurors voting to convict and three voting to acquit. It appears that either two or three of the jurors who voted to acquit were black (*see* Part I.C. *infra*).

McCray was retried, with the same Assistant District Attorney ("ADA") as prosecutor. Under N.Y.Crim.Proc.Law § 270.-25(2)(b) (McKinney 1982), each side was entitled to fifteen peremptory challenges. After the exercise of eleven or twelve challenges by the State, McCray moved for a mistrial on the ground that the prosecutor appeared to be systematically using the State's peremptory challenges to exclude blacks and Hispanics from the jury. In support of this contention, McCray pointed out that "[t]here have been seven black people and one Hispanic ven[ire]man up to this point. [The prosecutor] has challenged each and every one of them. Of her eleven challenges, she has used eight to challenge blacks and Hispanics." (Transcript of hearing dated April 24, 1980, at 5.) McCray requested a hearing at which the prosecutor would be asked to testify as to why she excluded the venirepersons she did. Following argument by McCray's counsel, the court denied the request for a hearing and the motion for a mistrial. The record does not reflect that the prosecutor made any statement with regard to her use of challenges.

In a later opinion explicating its denial of the motion, *People v. McCray*, 104 Misc.2d 782, 429 N.Y.S.2d 158 (Sup.Ct. Kings County 1980), the court stated that the prosecutor had denied excusing jurors on the ground of race. *Id.* at 783, 429 N.Y.S.2d at 159. The court stated that it had denied the motion for a mistrial because of the presumption that peremptory challenges are properly exercised and the administrative burden that would be entailed in reviewing their exercise. The court further reasoned that excusing a juror of the same race as the defendant on the ground of perceived group affinity is "a time honored basis for the exercise of peremptory challenges." *Id.* at 784, 429 N.Y.S.2d at 159.

The case against McCray proceeded to trial before an all-white jury (*see* Part I.D. *infra*). The only evidence against him was the identification made by Roberts. The jury found McCray guilty, as charged, of first and second degree robbery. McCray was sentenced to concurrent prison terms of 2 to 6 years on the first degree robbery charge and 1½ to 4½ years on the second degree robbery charge.

Prior to sentencing, McCray moved for a new trial, again attacking the State's use of its peremptory challenges. The court denied the motion. McCray pursued his contention on appeal without success. The Appellate Division affirmed without opinion, 84 A.D.2d 769, 444 N.Y.S.2d 972 (2d Dep't 1981). The New York Court of Ap-

peals affirmed in a 4–3 decision, 57 N.Y.2d 542, 457 N.Y.S.2d 441, 443 N.E.2d 915 (1982). The Court of Appeals majority, relying on *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), concluded that neither federal nor state constitutional rights were implicated in the prosecutor's striking of all minority venirepersons, stating that "[t]he benefits of requiring the prosecutor to justify the exercise of certain peremptory challenges are simply outweighed by the damage to a system of jury selection which best serves to guarantee a fair and impartial jury." 57 N.Y.2d at 549, 457 N.Y.S.2d at 445, 443 N.E.2d at 919. The three dissenters viewed *Swain* as not controlling in light of the Sixth Amendment's guarantee of an impartial jury from which no large, identifiable segment of the community has been systematically excluded. *Id.* at 552–53, 457 N.Y.S.2d at 447, 443 N.E.2d at 921 (Meyer, *J.,* dissenting); *id.* at 556–57, 457 N.Y.S.2d at 449, 443 N.E.2d at 923 (Fuchsberg, *J.,* dissenting).

### B. *The Denial of Certiorari*

McCray then sought a writ of certiorari from the United States Supreme Court. The Court denied the petition, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983), but five Justices indicated their view that a discriminatory exercise of prosecutorial peremptories should not be considered beyond judicial scrutiny. Justice Marshall, joined by Justice Brennan, dissented from the denial of certiorari, on the ground that "*Swain* was decided before this Court held that the Sixth Amendment applies to the states through the Fourteenth Amendment ... and .... should be reconsidered in light of Sixth Amendment principles established by our recent cases." *Id.* at 2441 (opinion of Marshall, *J.,* dissenting). Three Justices, in an opinion by Justice Stevens, joined by Justices Blackmun and Powell, stated that they did not disagree with Justice Marshall's assessment of the importance of the issue. Rather, they voted to deny certiorari on the ground that "further consideration of the substantive and procedural ramifications of the problem by other courts will enable us to deal with the issue more wisely at a later date." *Id.* at 2438 (opinion of Stevens, *J.*).

McCray moved in the New York Court of Appeals for reargument in light of the opinions accompanying the Supreme Court's denial of certiorari. The motion was denied without opinion, 60 N.Y.2d 587, 467 N.Y.S.2d 1031, 454 N.E.2d 127 (1983).

### C. *The Present Habeas Petition*

Having exhausted his state remedies, McCray filed the present petition for habeas corpus in the district court pursuant to 28 U.S.C. § 2254 (1976), alleging that "[t]he prosecution's use of peremptory challenges to exclude all minority members (7 blacks, 1 hispanic) drawn for the jury panel on the basis of race violates the Sixth Amendment right to trial by an impartial jury and the Equal Protection Clause of the Fourteenth Amendment." (Petition for Writ of Habeas Corpus, filed October 3, 1983, ¶ 11.) In support of the petition, the attorney who had represented McCray at his second trial submitted an affidavit stating, *inter alia,* that it was his recollection that the three jurors who had voted to acquit McCray at his first trial had been the three black jurors; that during jury selection at the second trial, conducted by the same ADA who conducted the first trial, he "noticed that [the prosecutor] was pre-emptorily [*sic* ] challenging every single black and hispanic potential juror"; that the prosecutor peremptorily challenged seven blacks and one Hispanic, at least three of whom had not stated that they knew anyone who had committed a crime or knew anyone accused or suspected of committing a crime; and that one of the blacks peremptorily challenged stated that he had either a relative or a close friend who was a victim of a crime and who had been shot during the course of a robbery.

In opposition to the petition, the State agreed that the Constitution should be construed to prohibit the prosecutor from using peremptory challenges to exclude potential jurors solely on the basis of race,

and urged the court to prohibit such use by the defendant as well. The State argued that in the present case McCray had not made a prima facie showing that the prosecutor used peremptory challenges to exclude jurors solely on the basis of race. It asserted that the prosecutor had not used peremptory challenges to exclude every minority member drawn for the jury panel, it being the recollection of both trial counsel that one black juror had been selected to serve as an alternate. It stated that defense counsel had conceded that at least some of the minority jurors challenged by the prosecutor had made statements during the voir dire that would lead the prosecutor to seek to excuse them. The State conceded that the prosecutor had exercised seven peremptory challenges against blacks and one against a Hispanic, and stated that she had used either three or four against white venirepersons. Relying on the trial court's opinion, 104 Misc.2d at 783, 429 N.Y.S.2d at 159, the State asserted that when the prosecutor's use of peremptory challenges was questioned during the jury selection process, the prosecutor had denied excusing jurors on the basis of race. The State did not, prior to the district court's announcement of its decision on McCray's petition, submit an affidavit from the ADA who had conducted McCray's trials.

On December 19, 1983, in an opinion reported at 576 F.Supp. 1244, Judge Nickerson ruled in favor of McCray. The court ruled that judicial scrutiny of discriminatory prosecutorial peremptory challenges was required by the Sixth Amendment. *Id.* at 1248. Further, relying on the opinions accompanying the Supreme Court's denial of McCray's petition for certiorari, the court concluded that *Swain v. Alabama* is no longer good law, and that "[t]he equal protection clause should be construed to prohibit a prosecutor's exercise of peremptory challenges to exclude blacks solely on the basis of race in any case." *Id.* at 1249.

According considerable weight to state court developments in California and Massachusetts, *see Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62

L.Ed.2d 110 (1979); *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), Judge Nickerson set out the procedure to be followed when the defense alleges that the prosecution is abusing its peremptory challenges. If the prosecution's peremptories have been used in such a way as to establish a prima facie case of racial discrimination, the presumption of proper use of the peremptory gives way and the burden shifts to the prosecution to justify its challenges on nonracial grounds. Citing *Wheeler,* the court held that a prima facie case of improper challenges may be established when the venirepersons excluded are members of a " 'cognizable group' discrimination against which is prohibited," and the probable reason for their exclusion is their membership in the group rather than any predisposition regarding the specific case at bar. 576 F.Supp. at 1249. Once this showing is made, the prosecution may rebut the prima facie case by demonstrating that its peremptory challenges were motivated by perceived case-specific biases, rather than by group association. Its explanations need not rise to a level that would warrant a challenge for cause. Concluding that the trial court had erred by failing to inquire into the bases for the prosecution's use of peremptory challenges against black and Hispanic venirepersons, the district court ruled that a new trial was constitutionally required.

After the district court rendered its decision, the State moved to "amend the judgment and to expand the record," contending that the court had overlooked vital criteria for determining whether McCray had established a prima facie case, and that the State was entitled to a hearing on the merits of McCray's contention. In support of this motion, the State submitted an affidavit from the former ADA who had conducted McCray's trials, describing her use of peremptory challenges and the proceedings on McCray's motion for a mistrial during the jury selection process. The affidavit stated that the prosecutor had not discriminated on the basis of race in selecting jurors for the trials of McCray; that she

had challenged a number of jurors as a result of their or their family's negative experiences with the criminal justice system because she believed those jurors were biased against the prosecution; that she had unsuccessfully sought to have those jurors excused for cause before excusing them peremptorily; and that the first alternate juror was black and that she did not excuse him although she still had peremptory challenges available. The prosecutor stated that the trial judge had convened a hearing on McCray's motion for a mistrial; that the court asked her whether she had discriminated on the basis of race in selecting the jury and that she had answered in the negative; that she asked for permission to explain, relying on notes she had kept, the reasons for her peremptory challenges; and that the judge refused her permission to explain, stating that he was satisfied that she had not discriminated on the basis of race in making her challenges. The prosecutor stated that after McCray's first trial, she had interviewed those jurors at some length and that to the best of her recollection, of the three jurors who voted for acquittal two were black and one was white, and that, according to the jurors interviewed, the white juror who voted for acquittal was the "motivating force" behind the remaining two votes for acquittal.

Judge Nickerson treated the State's motion to amend judgment and expand the record as a motion for reargument of the petition and denied it without comment. This appeal followed.

### D. The Issues on This Appeal

On this appeal, the State makes a relatively narrow challenge to the district court's decision. Its position is that the court correctly held that the Sixth and Fourteenth Amendments bar the use of peremptory challenges to strike potential jurors on the basis of race. Further it states that the recollections of both trial counsel agree that the jury that convicted McCray consisted of twelve white jurors. The State argues only that McCray failed to establish a prima facie case of the

State's racially discriminatory use of its peremptories, and that even if he did make the necessary prima facie showing, the court should not have granted the writ without holding a hearing to allow the State to present rebutting evidence.

Notwithstanding the State's doctrinal concessions, we must begin with a review of the court's ruling that the Sixth and Fourteenth Amendments bar the prosecutor's discriminatory use of peremptory challenges, for the constitutional doctrine informs the analysis of both whether a prima facie case has been established and what proceedings should follow the establishment of such a case. Our review persuades us that the court correctly ruled that the Sixth Amendment prohibits the prosecution's use of challenges to discriminate on the basis of race and that McCray presented sufficient evidence to establish a prima facie case of such use. We agree with the State, however, that the State should have been accorded an opportunity to rebut that showing.

### II. Equal Protection and *Swain v. Alabama.*

We begin with a review of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, which is the only United States Supreme Court decision thus far to address directly the constitutional validity of the use of peremptory jury challenges to discriminate on the basis of race. Although much criticized, *Swain* has led most courts to reject all constitutional challenges to the prosecutor's alleged discriminatory use of peremptories.

### A. Swain v. Alabama

Swain was a black defendant convicted by an all-white jury of the rape of a white woman. In his case, the trial jury venire had included eight blacks, two of whom were exempt; the prosecution used its peremptory challenges to remove the other six. Swain also showed that in the county in which he was tried, there had not since 1950 "been a Negro on a petit jury in either a civil or criminal case ... and that in

criminal cases prosecutors ha[d] consistently and systematically exercised their strikes to prevent any and all Negroes on petit jury venires from serving on the petit jury itself." 380 U.S. at 223, 85 S.Ct. at 837; *see also id.* at 231–32, 85 S.Ct. at 841–42 (Goldberg, *J.*, dissenting: "[P]etitioner established by competent evidence ... that no Negro within the memory of persons now living has ever served on any petit jury in any civil or criminal case tried in Talladega County, Alabama."). Invoking a long line of cases beginning with *Strauder v. West Virginia,* 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1880), that had held that "a State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause," *Swain v. Alabama,* 380 U.S. at 203–04, 85 S.Ct. at 826–27 (citing *Ex parte Virginia,* 10 Otto 339, 100 U.S. 339, 25 L.Ed. 676 (1880); *Gibson v. Mississippi,* 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896)), Swain contended, *inter alia,* that the prosecution's use of its peremptory challenges constituted invidious discrimination in the selection of jurors, in violation of his rights under the Equal Protection Clause. The Supreme Court disagreed.

In Part II of its opinion, the Court discussed at some length the history and purposes of the peremptory challenge. Tracing such challenges back past The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), the Court noted the persistent use of peremptories in American trials and the prevailing view that they are a necessary part of a trial by jury, for they allow the challenge of a person thought to be less than fair and impartial but for whom cause to strike cannot be shown, and permit the removal of a person who may have been offended by a probing voir dire. The Court stated that "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control," 380 U.S. at 220, 85 S.Ct. at 836, and that " 'it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of

its full purpose,' " *id.* at 219, 85 S.Ct. at 835 (quoting *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)).

Given the nature and the history of the peremptory challenge, the Court found merit in the proposition that the system, "in and of itself, provides justification for striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes." 380 U.S. at 212, 85 S.Ct. at 831. The Court concluded that "we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws." *Id.* at 221, 85 S.Ct. at 836.

> In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, *we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.* The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. *The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.* Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it.

*Id.* at 222, 85 S.Ct. at 837 (emphasis added).

The Court went on to say, in Part III of its opinion, that a defendant could require judicial inquiry into the prosecutor's use of peremptory challenges if he could show that

> the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have sur-

vived challenges for cause, with the result that no Negroes ever serve on petit juries.... If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify.

*Id.* at 223–24, 85 S.Ct. at 837–38. The Court found, however, that Swain had not met this standard of proof.

### B. *Mission Impossible*

Not surprisingly, almost no other defendants in the nearly two decades since the *Swain* decision have met this standard of proof either. For example, in *United States v. Carter*, 528 F.2d 844 (8th Cir. 1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976), the defendant showed that "[d]uring the year 1974 in the 15 cited cases involving black defendants a total of 70 Negroes were potentially available as trial jurors and 57 of those were stricken by the government through the use of its peremptory challenges." *Id.* at 848. At Carter's first trial two of four blacks were peremptorily challenged by the government; at his second trial, all five blacks were so challenged. His equal protection argument was rejected. In *United States v. Danzey*, 476 F.Supp. 1065 (E.D.N.Y.1979), *aff'd mem.,* 620 F.2d 286 (2d Cir.), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980), four blacks were peremptorily challenged by the government, and one black was seated on the jury only after the prosecutor had exhausted his challenges. The prosecutor explained to the trial judge: "I make it a practice to attempt to exclude as best I can all jurors so that to [*sic*] exclude jurors of the same ethnic background as the defendant." *Id.* at 1066. Danzey's equal protection argument was rejected.[2] Not until *State v. Brown*, 371 So.2d 751 (La.1979), and *State v. Washington*, 375 So.2d 1162 (La.1979), involving a prosecutor who admitted the practice of striking blacks and whose use of peremptory challenges had been repeatedly appealed by black defendants, did any court find the *Swain* burden satisfied.

As Justice Marshall noted in his dissent to the denial of McCray's petition for certiorari, "[i]n the nearly two decades since it was decided, *Swain* has been the subject of almost universal and often scathing criti-

---

**2.** Equal protection challenges were likewise rejected in, *e.g., United States v. Pearson*, 448 F.2d 1207, 1213–17 (5th Cir.1971) (In trials held during a certain week, the government peremptorily challenged 10 out of 12 blacks in cases where the defendant was black, but only three out of 12 blacks where the defendant was white.); *State v. Davis*, 529 S.W.2d 10 (Mo.Ct.App.1975) (The prosecution peremptorily challenged seventy-five percent of black venirepersons in thirty-one criminal cases involving black defendants.); *see also United States v. Newman*, 549 F.2d 240 (2d Cir.1977) (rejecting statistical evidence as not probative of extent to which blacks were peremptorily excused within division in which trial was held); *United States v. Boyd*, 610 F.2d 521, 526 (8th Cir.1979), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Durham*, 587 F.2d 799, 801 (5th Cir.1979); *United States v. McLaurin*, 557 F.2d 1064, 1076 (5th Cir.1977) (of six blacks in original venire, one excused for cause, other five excused peremptorily by government), *cert. de-* *nied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Nelson*, 529 F.2d 40, 42–43 (8th Cir.) (all three blacks peremptorily challenged by government), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976); *United States v. Pollard*, 483 F.2d 929, 930 (8th Cir.1973) (all four blacks peremptorily challenged by government), *cert. denied,* 414 U.S. 1137, 94 S.Ct. 882, 38 L.Ed.2d 762 (1974); *Greene v. United States*, 486 F.Supp. 199, 200 (W.D.Mo.) (all five blacks peremptorily challenged by government), *aff'd,* 626 F.2d 75 (8th Cir.) (per curiam), *cert. denied,* 449 U.S. 876, 101 S.Ct. 220, 66 L.Ed.2d 98 (1980); *Rogers v. State*, 257 Ark. 144, 515 S.W.2d 79 (1974) (all six blacks peremptorily challenged by state), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). *See generally* Annot., 79 A.L.R.3d 14 (1977) (*Swain* standard not found satisfied in any case from any jurisdiction); J. Van Dyke, *Jury Selection Procedures* 154–60 & nn. 73–98 (1977).

cism." *McCray v. New York,* 461 U.S. 961, 963, 103 S.Ct. 2438, 2440, 77 L.Ed.2d 1322 (1983) (opinion of Marshall, *J.,* dissenting; footnote, citing numerous writings, omitted). *See, e.g.,* Comment, Swain v. Alabama: *A Constitutional Blueprint for the Perpetuation of the All-White Jury,* 52 Va.L.Rev. 1157 (1966); Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries,* 86 Yale L.J. 1715, 1723 & n. 36 (1977); Winick, *Prosecutorial Peremptory Challenge Practice in Capital Cases: An Empirical Study and a Constitutional Analysis,* 81 Mich.L.Rev. 1, 10–11 (1982). Many of these commentaries have been critical, in our view rightly, of the nearly impossible task set for the defendant in Part III of the *Swain* opinion, *i.e.,* to show that in all cases, in all circumstances, whoever the victim, whoever the defendant, blacks were excluded from juries without cause.

We disagree as well with some of the fundamental premises found in Part II of *Swain.* For example, the Court's statement that there was no violation of equal protection because blacks and whites "are alike subject to being challenged without cause," 380 U.S. at 221, 85 S.Ct. at 836, ignores practice. In most communities a majority of those eligible for jury duty are white; and as a practical matter, the prosecution does not peremptorily excuse whites simply because they are whites. Thus, although the implication in Part III of *Swain* is that "the Negro [should have] the same right and opportunity to participate in the administration of justice enjoyed by the white population," *id.* at 224, 85 S.Ct. at 838, we think the assumption of Part II that that right is not violated simply because both blacks and whites are "subject to" being peremptorily excluded is fanciful.

More importantly, *Swain's* basic premise furthers the erosion of that right. The *Swain* Court found it permissible for a

prosecutor to eliminate all blacks in any given case simply because they are blacks, because the "presumption ... must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury ...." *Id.* at 222, 85 S.Ct. at 837. The implication of this presumption, however, is that in any given case before the court, whites can be fair and impartial, whereas blacks, simply because they are blacks, cannot. The application of this premise as *Swain* suggests to "any given" case—as for example, where a black defendant is accused of a homicidal attack on a white person, *e.g., Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), or where there may be less of a racial undercurrent, as where a black defendant is accused of receiving stolen property, *e.g., People v. Thompson,* 79 A.D.2d 87, 435 N.Y.S.2d 739 (2d Dep't 1981), *appeal withdrawn,* 55 N.Y.2d 879 (1982), or even where a white defendant is charged with an offense against a white victim, *e.g., Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972)—results in the conclusion that in each case only white jurors will be sufficiently fair and impartial to adjudicate the controversy. Yet, it is fallacious to assume that all persons sharing an attribute of skin color, or of gender or ethnic origin, *etc.,* will *ipso facto* be partial to others sharing that attribute. Thus, in jury selection contexts other than those involving peremptory challenges, the Court has rejected the notion that a particular racial or ethnic group will make determinations solely on the basis of their group affiliation. In *Ristaino v. Ross,* for example, the Court ruled that "[t]he mere fact that the victim of the crimes alleged was a white man and the defendants were Negroes" did not give the defendant a constitutional right even to cause a voir dire question relating specifically to racial prejudice to be asked in addition to the usual questions as to general bias.[3] 424 U.S. at

---

**3.** *Compare Ross with Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), in which the Court had held that the Due Process Clause required the granting of the defendant's request for voir dire questions exploring

racial prejudice because the black defendant was charged with possession of marijuana, was a civil rights activist, and contended that he had been framed because of his civil rights activities.

597, 96 S.Ct. at 1021. And in *Castaneda v. Partida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977), the Court rejected any presumption that a given ethnic group will *not* discriminate *against* members of their own group.

According to *Swain*, however, there is no type of case in which blacks *qua* blacks may not be summarily eliminated on the presumption that the prosecutor is merely seeking a "fair and impartial jury." The premise of *Swain* and the rarity of wholesale challenges to white venirepersons thus serve only to limit artificially the opportunity of blacks for participation in our system of justice, and to perpetuate an invidious proposition of racial inferiority that has been outlawed in virtually every area of public affairs—in employment, in education, in housing, in property rights. How unfortunate that the invidious proposition has been allowed to flourish in the administration of justice.

## C. State Court Developments

In light of the near impossibility experienced by defendants in attempting to meet the requirements set by *Swain*, a small number of state courts have fashioned standards based on their state constitutions to guarantee to the defendant a trial before a jury that has not had cognizable groups eliminated by the discriminatory acts of the prosecutor. In most instances, the state court was influenced by the fact that at the time *Swain* was decided, the Supreme Court had not yet ruled that the guarantee of the Sixth Amendment of trial by an impartial jury was binding on the states through incorporation into the Due Process Clause of the Fourteenth Amendment.

The first such case was *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). In *Wheeler*, the prosecutor had peremptorily challenged every black person called from the venire, without any effort to challenge them for cause and with little or no questioning that could have disclosed any biases. The California Supreme Court ruled that the use of peremptory challenges to remove prospective black jurors on the sole ground of "group association" violated the defendant's right to a jury drawn from a representative cross section of the community, as guaranteed by Article I, Section 16 of the California Constitution ("Trial by jury is an inviolate right and shall be secured to all ...."). The court stated that while the constitutional provision did not grant the defendant a right to a jury that mirrored the demographic composition of the population, it did entitle him to "a petit jury that is as near an approximation of the ideal cross-section of the community as the process of a random draw permits." 148 Cal.Rptr. at 904, 583 P.2d at 762.

The *Wheeler* court stated that the defendant could establish a prima facie case by showing that the persons excluded were members of a cognizable group within the meaning of the representative cross-section rule, and that there was a strong likelihood that these prospective jurors were challenged not as a result of any specific bias but only because of their group association. Upon such a showing by the defendant, the burden shifts to the prosecution to justify its use of the peremptory challenge on specific bias grounds reasonably relevant to the case at hand. The prosecution's reasons need not rise to the level needed to sustain a challenge for cause. *Id.*, at 906–07, 583 P.2d at 764–65.

*Wheeler* was followed shortly by *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), in which the prosecution had peremptorily challenged twelve of the thirteen black jurors drawn from the panel. Following the lead of the California Supreme Court in *Wheeler*, the Massachusetts Supreme Judicial Court ruled that Article 12 of the Declaration of Rights of the Massachusetts Constitution, which guarantees the right to trial by jury of one's peers, protected the defendant against the prosecution's use of its challenges on racially discriminatory grounds.

In *State v. Crespin*, 94 N.M. 486, 612 P.2d 716 (Ct.App.1980), the Court of Ap-

peals of New Mexico rejected a claim by a defendant that his constitutional rights had been violated when the prosecution used a peremptory challenge to excuse the one black member of the venire, holding that the defendant had not made out a prima facie case of discrimination. The court went on to state, however, that "improper, systematic exclusion by use of peremptory challenges can be shown ... under the *Wheeler-Soares* rationale and supported by Article II, Section 14 of the New Mexico Constitution, where the absolute number of challenges in the one case raises the inference of systematic acts by the prosecutor." 612 P.2d at 718.

In New York, two courts ruled that the New York Constitution forbade the prosecutor's discriminatory use of his peremptory challenges. In *People v. Kagan*, 101 Misc.2d 274, 420 N.Y.S.2d 987 (Sup.Ct.N.Y. County 1979), in which the defendants were Jewish, the trial court ruled that the prosecutor was forbidden to use his peremptories to challenge Jews simply because they were Jews. The court found, however, that the defendants had not established a prima facie case of such use. In *People v. Thompson*, 79 A.D.2d 87, 435 N.Y.S.2d 739 (1981), in which the defendant was black, the Appellate Division, after "extensive and thoughtful analysis," *People v. McCray*, 57 N.Y.2d at 552 n. 1, 457 N.Y. S.2d at 446 n. 1 (Meyer, *J.*, dissenting), ruled that the prosecution's use of all of its peremptory challenges to excuse all black venirepersons violated the New York Constitution. The appellate court quashed the results of the jury selection procedures and ordered a new trial.[4] Both *Kagan* and *Thompson* appear to have been overruled *sub silentio* by the New York Court of

Appeals's ruling in *People v. McCray*. See also *People v. Payne*, 106 Ill.App.3d 1034, 62 Ill.Dec. 744, 436 N.E.2d 1046 (1982), *rev'd*, 99 Ill.2d 135, 75 Ill.Dec. 643, 457 N.E.2d 1202 (1983).

Most recently, in *State v. Neil*, 457 So.2d 481 (Fla.1984), the Florida Supreme Court "[b]elieving that it is time in Florida to hold that jurors should be selected on the basis of their individual characteristics and that they should not be subject to being rejected solely because of the color of their skin," *id.* at 482, held that Article I, section 16 of the Florida Constitution prohibits both the state and the defense from using peremptory challenges in any given case to exclude prospective jurors solely because of their race, *id.* at 486–487. The court ruled that the test set out in *Swain* is no longer to be used by Florida courts when confronted with an allegation of discriminatory use of peremptories.

D. *Applicability of Swain's Equal Protection Analysis to the Present Case*

■ In light of (a) the criticisms of *Swain*, (b) the developments in Sixth Amendment doctrine since the decision of *Swain*, (c) the state court developments curtailing the use of peremptory challenges on a discriminatory basis, and (d) the intimations in the opinions joined by five Justices in connection with the denial of McCray's petition for certiorari that the time is drawing near for a reconsideration of *Swain*, both McCray and the State urge us to rule that *Swain* is no longer good law. While the assaults on *Swain* are not without considerable force, we are constrained to note that, on the question of the vulnerability of the prosecution's use of peremptory challenges to attack under the

---

4. The standard of appellate review suggested by the court in *People v. Thompson* differed somewhat from that suggested by the *Wheeler* and *Soares* courts. The *Thompson* court indicated that even if a significant number of black jurors had been peremptorily challenged, the trial court need not inquire into the prosecutor's reasons for those challenges if the trial court's own observations of the jury selection process indicated that the peremptories were properly exercised. 79 A.D.2d at 110–11, 435 N.Y.S.2d at

755. The court concluded that since the reasons underlying the use of peremptory challenges may "not [be] as readily apparent to those who were not in the position of the Judge who attended the *voir dire*," the exclusion of a significant number of black jurors would be "insufficient, in and of itself, to warrant reversal of a trial court's determination not to make inquiry" into the use of the challenges. *Id.* at 111, 435 N.Y.S.2d at 755; *accord State v. Neil*, 457 So.2d 481 at 485–486 (Fla.1984).

Equal Protection Clause, *Swain* is clear, direct, and unequivocal. It states that a defendant may not mount a successful equal protection challenge to the prosecution's racially discriminatory use of its peremptory challenges solely on the basis of the prosecution's acts in a single case. Since McCray's contentions rest solely on the State's use of its peremptories in his own case, he does not meet the requirements set by *Swain*. We therefore decline to rest our decision in this case on equal protection principles.

We are not, however, required to read *Swain* as setting the standards for all other provisions of the Constitution. It is true that at the end of Part II of the *Swain* opinion, the Court stated that in light of the importance of the peremptory challenge system it could not hold that "the Constitution" required an examination into the prosecution's reasons for the exercise of such challenges. 380 U.S. at 222, 85 S.Ct. at 837. And we note that at least one commentator has taken these words literally, inferring that *Swain* has held the peremptory challenge "immune ... from federal constitutional inquiry of any sort." *The Supreme Court, 1982 Term*, 97 Harv. L.Rev. 70, 194 (1983). We think it inappropriate and improvident to consider this reference out of the context of the opinion as a whole. All of the Court's constitutional analysis focused on the Equal Protection Clause. We do not believe the single general reference was intended to remove this focus.

Nor do we view *United States v. Newman*, 549 F.2d 240 (2d Cir.1977), the only prior opinion of this Court addressing the prosecution's peremptory use of its challenges on a racial basis, as dispositive of Sixth Amendment issues. *Newman* was argued and decided on the basis of district-wide statistical data submitted in support of a due process theory. The Court disagreed with the use of district-wide data, noting that the community of which a jury is to represent a fair cross section is the division in which the defendant is tried, not the entire district. The Court held that *Swain* was the governing authority and

that the statistical analysis was flawed, and concluded that the "due process claims made by the defendants in this case have no support in law nor do the facts alleged have support in the evidence." *Id.* at 250. We see no evidence in the *Newman* opinion that the parties presented any substantial argument that the government's racially discriminatory use of its peremptories in a given case might violate the Sixth Amendment.

Accordingly, we turn now to the Sixth Amendment.

### III. THE SIXTH AMENDMENT

The Sixth Amendment to the Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ...." In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 497 (1968), decided three years after *Swain*, the Supreme Court ruled that this provision is applicable to the states:

> Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee.

*Id.* at 149, 88 S.Ct. at 1447 (footnote omitted). Many cases construing the scope of the states' responsibilities in light of the Sixth Amendment's guarantee were to follow.

### A. The Development of Sixth Amendment Doctrine As Applicable to the States

In a long sequence of cases, the Supreme Court has faced such questions as whether the Sixth Amendment permitted the exclusion of blacks, women, and conscientious objectors from jury panels; whether jury verdicts of guilty could be less than unanimous; and whether juries could consist of groups smaller than the traditional twelve. The answers to these questions have var-

ied, but the touchstone of each analysis has been whether the practice in question deprived the defendant of the possibility of a jury that represented a cross section of the community.

In *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Court considered whether the Sixth Amendment required that all juries consist of twelve persons, rather than six as permitted by Florida law for noncapital offenses. Noting that *Duncan v. Louisiana* had described the rationale for a right to a jury trial as providing "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge," 391 U.S. at 156, 88 S.Ct. at 1451, the *Williams* Court stated that

the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.

399 U.S. at 100, 90 S.Ct. at 1906. The Court concluded that the twelve-person requirement was not of constitutional dimension and that a six-person jury was of sufficient size to comprise a cross section of the community. The Court stated that the number of persons on the jury should "be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community." *Id.*

In *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), the Court ruled that a jury of five was too small. Six Justices observed that so limited a number probably could not adequately include a cross section of the community. *See id.* at 239, 242, 98 S.Ct. at 1038, 1040 (opinion of Blackmun, *J.,* expressing "substantial doubt about the ability of juries truly to represent the community as membership decreases below six"); *id.* at 245, 98 S.Ct. at 1042 (opinion of White, *J.:* "a jury of fewer than six persons would fail to repre-

sent the sense of the community and hence not satisfy the fair cross-section requirement of the Sixth and Fourteenth Amendments ...."); *id.* at 246, 98 S.Ct. at 1042 (opinion of Brennan, *J.*).

In *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), the Court ruled that the Sixth Amendment did not prohibit the states from allowing conviction by verdicts of 11–1 or 10–2 rather than requiring unanimity. Four Justices observed that

"... the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ...." *Williams v. Florida, supra,* [399 U.S.] at 100 [90 S.Ct. at 1906]. A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment. As we said in *Williams,* a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant's guilt.

406 U.S. at 410–11, 92 S.Ct. at 1633 (opinion of White, *J.*). Similarly a fifth Justice stated that "the Court has held that criminal defendants are entitled, as a matter of due process, to a jury drawn from a representative cross section of the community. This is an essential element of a fair and impartial jury trial." *Johnson v. Louisiana,* 406 U.S. 356, 378, 92 S.Ct. 1620, 1642, 32 L.Ed.2d 152 (1972) (opinion of Powell, *J.,* concurring in the judgment in *Apodaca v. Oregon* ).

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which may have been decided on the basis of due process, rather than Sixth Amendment, principles (*see* Part III.B. *infra* ), the Court considered a challenge to an Illinois statute that permitted the state to challenge for cause potential jurors who were opposed to capital punishment. Under the Illinois system, the jury not only decided guilt, but, if

it found the defendant guilty, it determined whether his sentence should be imprisonment or death. The Court reversed Witherspoon's conviction on the ground that it was

> self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments.

*Id.* at 518, 88 S.Ct. at 1775. The Court concluded that "in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of [persons who believe in that penalty] cannot speak for the community." *Id.* at 519–20, 88 S.Ct. at 1776 (footnote omitted).

In *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Court considered a statute that provided that no woman was to be selected for jury service unless she had filed with the clerk of the court a written declaration of her desire to serve. The result was that in the parish in which the petitioner was tried, although 53% of those eligible for jury service were women, no more than 10% of the venirepersons were women. The Court concluded that the provision violated the Sixth Amendment since it operated to exclude women from jury service and thus unduly restricted the possibility of a defendant's having a petit jury that represented a fair cross section of the community:

> We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. *Duncan v. Louisiana*, 391 U.S., at 155–156 [88 S.Ct., at 1450–1451]. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool.

Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

419 U.S. at 530, 95 S.Ct. at 697–698. The *Taylor* Court concluded that "[i]f the fair-cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be systematically excluded from jury panels from which petit juries are drawn." 419 U.S. at 533, 95 S.Ct. at 699.

The Court cautioned that it did not mean to imply that petit juries actually chosen must mirror the community or reflect the various distinctive groups in the population. Its holding was not that the defendant was guaranteed a jury of a particular composition, but rather that he was entitled to a venire from which distinctive groups had not been systematically excluded. 419 U.S. at 538, 95 S.Ct. at 701.

In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Court struck down a statute that exempted women from jury duty upon their request for exemption. The Court held that "such systematic exclusion of women that results in jury venires averaging less than 15% female violates the Constitution's fair-cross-section requirement." *Id.* at 360, 99 S.Ct. at 666.

The Court's acknowledgement of the cross-section ideal in state trials is also reflected in many of its earlier rulings in federal cases. In *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Court analyzed the nature of the right to a jury trial in the context of the Sixth Amendment's strictures on the federal government and concluded that it would be impermissible to limit venirewomen to those who were members of specific civic organizations:

[T]he proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community," and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted.

315 U.S. at 86, 62 S.Ct. at 472.

Similarly, in *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), the Court exercised its supervisory power to bar the exclusion of women from jury service in the federal courts, observing as follows:

The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded.

*Id.* at 193–94, 67 S.Ct. at 264 (footnote omitted). And in *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), a civil case, the Court held improper the routine exclusion from the jury venire of all persons who worked for a daily wage:

The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.

*Id.* at 220, 66 S.Ct. at 985 (citations omitted).

More recently, in *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), in which the Court remanded, on due process grounds, for a hearing on the allegations of a white defendant that blacks had been systematically excluded from the grand jury that indicted him and the petit jury that convicted him, three Justices elaborated as follows:

When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Id.* at 503–04, 92 S.Ct. at 2169 (opinion of Marshall, *J.;* footnote omitted). Even the three Justices who dissented from the judgment of the *Peters* Court

completely agree[d] that juries should not be deprived of the insights of the various segments of the community, for the "common-sense judgment of a jury," referred to in *Duncan v. Louisiana,* 391 U.S. 145, 156 [88 S.Ct. 1444, 1451, 20 L.Ed.2d 491] (1968), is surely enriched when all voices can be heard.

407 U.S. at 510–11, 92 S.Ct. at 2172 (Burger, *C.J.,* dissenting).

Finally, we note that in none of these cases did the Supreme Court require the defendant to make a showing that the jury that resulted from the challenged practices was in fact a biased jury. If the Court

found that the defendant had made a showing that the cross-section requirement had been violated, it concluded that he was entitled to relief or further proceedings simply on the basis of the violation of his Sixth Amendment right. *See, e.g., Taylor v. Louisiana,* 419 U.S. at 538–39, 95 S.Ct. at 701–02 (Rehnquist, *J.,* dissenting).

B. *The Import of the Sixth Amendment for the Final Phase of the Jury Selection Process*

The jury selection process obviously does not end with the assembling of the venire, and it is the final phase of the process, the actual selection of the petit jury, with which we are concerned here. Although, as discussed in Part II above, a few courts and commentators have concluded that peremptory challenges exercised at this stage may properly be subjected to the cross-section requirement,[5] a far larger body of case authority has developed in support of the proposition that the cross-section requirement of the Sixth Amendment does not extend to this final phase and thus has no applicability to the prosecution's exercise of its peremptory challenges.[6] The latter rulings are said to be mandated by the fact that most of the Supreme Court decisions invalidating the exclusion of cognizable groups in the jury selection process have focused on the selection of the venire rather than the selection of the petit jury, and by the Court's statement in *Taylor v. Louisiana,* 419 U.S. at 538, 95 S.Ct. at 701, that there is no requirement that the petit jury

actually reflect a cross section of the community.

■ We agree entirely with the proposition that the defendant has no right to a petit jury of any particular composition. The random drawing of petit jurors from the venire is by its very nature inconsistent with any guarantee of a particular resulting composition. But we disagree with the conclusion of those courts that have reasoned that the lack of such a guarantee means that the Sixth Amendment has no implications for the process of selecting the petit jury from the venire. We think such a conclusion is belied by the Supreme Court's repeated emphasis on the cross-section requirement of the Sixth Amendment and the fundamental value judgments underlying that requirement.

■ We begin by analyzing the goal of the guarantee that the venire itself represent a fair cross section of the community. The venire *qua* venire is a body that, assuredly, gives service to the community by standing ready to serve on a petit jury if called upon to do so; but it is a group that takes no action and makes no decisions. No defendant has ever been tried before a venire; the venire is not the body that deliberates in the jury room; no defendant has ever been found guilty by a venire. If there is a Sixth Amendment requirement that the venire represent a fair cross section of the community, it must logically be because it is important that the defendant have the chance that the petit jury will be similarly constituted. The necessary impli-

5. *See Grigsby v. Mabry,* 569 F.Supp. 1273, 1285–86 (E.D.Ark.), *stay granted,* 583 F.Supp. 629 (E.D.Ark.1983); *State v. Neil,* 457 So.2d at 486; *People v. Wheeler,* 148 Cal.Rptr. at 903–04, 583 P.2d at 761–62; *Commonwealth v. Soares,* 387 N.E.2d at 513; *State v. Crespin,* 612 P.2d 716; Winick, *supra,* 81 Mich.L.Rev. at 62–66; Note, *supra,* 86 Yale L.J. at 1731–32.

6. *See, e.g., United States v. Clark,* 737 F.2d 679 (7th Cir.1984); *United States v. Thompson,* 730 F.2d 82, 85 (8th Cir.1984); *United States v. Childress,* 715 F.2d 1313, 1319–20 (8th Cir.1983) (en banc), *cert. denied,* — U.S. —, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *Weathersby v. Morris,* 708 F.2d 1493, 1497 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 719, 79 L.Ed.2d 181

(1984); *People v. Williams,* 97 Ill.2d 252, 73 Ill.Dec. 360, 372–73, 454 N.E.2d 220, 232–33 (1983), *cert. denied,* — U.S. —, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984); *People v. McCray,* 57 N.Y.2d at 545, 457 N.Y.S.2d at 442–43, 443 N.E.2d at 916–17. *See also Gilliard v. Mississippi,* — U.S. —, 104 S.Ct. 40, 40–44, 78 L.Ed.2d 179 (1983) (Marshall, *J.,* dissenting from denial of certiorari (collecting cases)); *State v. Neil,* 457 So.2d at 484 n. 3 (collecting cases); Saltzburg & Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation,* 41 Md.L.Rev. 337, 360 (1982); Note, *The Defendant's Right to Object to Prosecutorial Misuse of the Peremptory Challenge,* 92 Harv.L.Rev. 1770, 1780 (1979).

cation is that the Sixth Amendment guarantees the defendant that possibility. It guarantees not that the possibility will ripen into actuality, but only the fair and undistorted chance that it will. We thus agree that the Sixth Amendment does not require any action to ensure that the representative character of the venire be carried over to the petit jury; we think the Amendment simply prohibits the state's systematic elimination of the possibility of such a carry-over.

Our conclusion that the Sixth Amendment guarantees the defendant the possibility of a cross-sectional petit jury is supported by, for example, *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234, in which there was no suggestion that the venire was improper. The Court held that the calling of only five persons from even a valid venire to form the petit jury was inconsistent with the Sixth Amendment, in part because so small a group had an unreasonably low possibility of comprising a cross section of the community. The state was not permitted to deal with the valid venire in a way that so limited the possibility that a fair cross section might be drawn.

We find even clearer support for the proposition that the process of selecting a jury from a proper venire is subject to constitutional scrutiny in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, which focused squarely on the challenge stage of the proceedings. There was no implication that those who objected to the death penalty were excluded from the venire; the venire was validly constituted. The statute that was invalidated was one that permitted the state to challenge for cause any venireperson who opposed the death penalty, and thus to eliminate such persons as a group in the very last phase of the jury selection process. *Witherspoon* is thus irreconcilable with the notion that the challenge stage of jury selection is not subject to constitutional scrutiny. If the only constitutional requirement were that there be a fair cross section on the venire, with no concern for what followed, the challenges for cause in *Witherspoon* would have escaped review.

We note that it is not entirely clear whether *Witherspoon* was decided on Sixth Amendment grounds or on due process grounds. The *Witherspoon* trial had occurred years before the Court's decision in *Duncan v. Louisiana* made the Sixth Amendment's jury trial requirements applicable to the states; and in *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968), announced two weeks after *Witherspoon,* the Court ruled that *Duncan* was not to be applied retroactively. Nonetheless, the *Witherspoon* Court stated that "this jury fell woefully short of that impartiality to which the petitioner was entitled under the *Sixth* and Fourteenth Amendments." 391 U.S. at 518, 88 S.Ct. at 1775 (emphasis added). In any event, even if *Witherspoon* was decided under general principles of due process rather than under the Sixth Amendment, it would defy reason to believe that the incorporation of the Sixth Amendment into the Fourteenth *lessened* the amount of scrutiny to be given to the final phase of the state jury selection process.

In sum, the conclusion we draw from the Supreme Court cases is that whatever the nature of the state statute or practice may be (*e.g.,* granting exemptions from jury service as in *Duren,* or adjusting the size of the petit jury as in *Ballew,* or defining "cause" to challenge as in *Witherspoon,* or departing from the traditional requirement of unanimity as in *Apodaca*), and whatever the stage of the selection process that is subjected to that statute or practice (*e.g.,* selection of the venire as in *Taylor,* or selection of the petit jury as in *Witherspoon,* or the operations of the petit jury as in *Apodaca*), the state is not permitted by the Sixth Amendment to restrict unreasonably the possibility that the petit jury will comprise a fair cross section of the community.

### C. *Peremptory Challenges and the Proper Scope of the Court's Focus*

We turn next to the questions of whether and on what basis peremptory challenges,

as contrasted with challenges for cause, may be subjected to scrutiny under the Sixth Amendment. As noted above, some believe that *Swain* immunized peremptory challenges from all constitutional scrutiny, and indeed, it appears that *Swain's* extensive review of the history of the peremptory challenge system and its conclusions as to the importance of that system in American jury trials have created a myth that peremptory challenges are sacrosanct. We believe the proper view is that they are not.

First, as the review in *Swain* makes clear, the peremptory challenge is not rooted in the Constitution; it existed at common law, and it is now a creature of rule and statute. But it is not provided for in the Constitution of the United States, nor in any state constitution that we know of. It is an important right; it may be an invaluable right in certain circumstances; but it is not a right of constitutional dimension. As a matter of sound jurisprudence, therefore, when a defendant has made a prima facie showing that the prosecution's use of its peremptories conflicts with a fundamental right that is protected by the Sixth Amendment, it is the inscrutability of the peremptory challenge that must yield, not the constitutional right.

Nor does *Swain* stand for the proposition that the peremptory challenge is beyond scrutiny even under the Equal Protection Clause. Part III of the *Swain* opinion, although dictum, set forth the circumstances that a defendant would have to show in order to subject the prosecution's use of peremptories to inquiry by the court. Although the standards set by *Swain* have proven to be practically impossible to meet, they were nevertheless enunciated. Plainly, therefore, even the *Swain* Court did not believe that peremptory challenges are immune from remedial judicial action should the defendant make a prima facie showing that they conflict with a constitutional right.

Finally, we see no meaningful distinction, for Sixth Amendment purposes, between a state's exclusion of identifiable groups from the petit jury by means of a statute or practice, as in *Witherspoon,* and the exclusion of such groups by means of the systematic action of the prosecutor, who is an agent of the state. The latter is equally state action and should be equally subject to scrutiny. Indeed, one of the rationales for according any right to a jury trial is that it provides "a hedge against the overzealous or mistaken prosecutor." *Taylor v. Louisiana,* 419 U.S. at 530, 95 S.Ct. at 698; *see Duncan v. Louisiana,* 391 U.S. at 156, 88 S.Ct. at 1451. Plainly the hedge is blighted if the prosecutor is allowed arbitrarily to remove entire segments of the panel and thereby destroy any possibility that the jury may represent a fair cross section of the community.

■ For purposes of determining what a defendant must show in order to establish a prima facie case of a prosecutor's use of peremptory challenges in violation of the Sixth Amendment, we think the principal difference between *Swain's* equal protection analysis and proper analysis under the Sixth Amendment lies in the appropriate scope of the court's focus. The Sixth Amendment provides that the right of the accused to trial by an impartial jury shall exist in "*all* criminal prosecutions." (Emphasis added.) Thus, that Amendment protects each defendant who is to stand trial, not simply the last in a sequence of defendants to suffer the deprivation of an impartial jury. Accordingly, we construe the Sixth Amendment's provision to require the court to decide each case on the basis of the acts or practices complained of in that very case, and not to require the defendant to show, as *Swain* requires for an equal protection claim, that those acts or practices have had undesirable effects in case after case. We confess that we are not sure why the Equal Protection Clause should protect only the last of a number of defendants to be subjected to discrimination, but we are sure that it is not sound to extend that proposition to the interpretation of a constitutional provision that is expressly directed to "all" criminal prosecutions.

Accordingly, we conclude that a defendant may appropriately subject to scrutiny under the Sixth Amendment the prosecution's use of its peremptory challenges on the basis of its actions in his own particular case.

### D. Impermissible Exclusions Under the Sixth Amendment

■ In addition to the Sixth Amendment's conception of the ideal jury as one that represents a cross section of the community, several principles provide guidance for determining whether an allegation of the systematic peremptory exclusion of blacks and Hispanics from the petit jury states a claim under the Amendment. First, the goal of jury selection is to assure that each juror is free from bias. By this we mean that he or she is likely to be able to decide the case solely on the basis of the evidence before the jury. *Swain v. Alabama,* 380 U.S. at 219, 85 S.Ct. at 835. Further, the notions that all persons who share an attribute, such as the same skin color, will *ipso facto* view matters in the same way, and that minority groups are less able than whites to decide the case solely on the basis of the evidence, are both fallacious and pernicious. "As early as 1880, [the Supreme] Court recognized that blacks as a class are no less qualified to sit on juries than whites . . . ." *Duren v. Missouri,* 439 U.S. at 371 n.*, 99 S.Ct. at 672 n.* (Rehnquist, *J.,* dissenting). Any notion that white persons can be objective in viewing a case on its merits and that blacks *qua* blacks cannot, is particularly objectionable. In a case where a black defendant has been charged with a crime that has aroused racial passions, one may believe that whites *qua* whites are more likely than blacks *qua* blacks to convict; this, however, does not bespeak a greater objectivity so much as it does a greater propensity to convict. Obviously, the responsibility of the state and its prosecutor is not to secure a conviction at all costs; it is to see that justice is done, and the constitutional wisdom is that justice is best served by a jury that represents a cross section of the community, not one from which cognizable groups have been systematically eliminated because of their group affiliation.

Accordingly, we conclude that the Sixth Amendment's guarantee of trial by an impartial jury allows the prosecution to exercise its peremptory challenges to excuse jurors to whom, on the basis of their personal history or behavior, some bias may be imputed; but it forbids the exercise of such challenges to excuse jurors solely on the basis of their racial affiliation.

### IV. PROCEDURES UNDER THE SIXTH AMENDMENT

In setting forth the factors that a defendant must show in order to establish a prima facie case that the prosecution has used its peremptories in a way that violates the Sixth Amendment, we think it appropriate to adapt the Supreme Court's test for the establishment of a prima facie case of a Sixth Amendment violation with respect to the venire, as set forth in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579. There the Court stated as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. at 668.

■ It is evident that the second factor stated by the *Duren* Court, *i.e.,* that the resulting group was in fact not representative of the community, is not applicable to the petit jury stage. The first and third factors, however, are plainly relevant and material. We conclude that in order to establish a prima facie violation of his right to the possibility of a fair cross section in the petit jury, the defendant must show that in his case, (1) the group alleged to be excluded is a cognizable group in the com-

munity, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

■ If the defendant establishes such a prima facie case, " ' "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." ' " *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976), which quoted *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)).

■ In order to rebut the .defendant's showing, the prosecutor need not show a reason rising to the level of cause. There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual. *See, e.g., People v. Hall*, 35 Cal.3d 161, 197 Cal.Rptr. 71, 75, 672 P.2d 854, 858 (1983) (en banc) (reasons proffered by prosecutor for peremptorily excusing blacks were equally applicable to whites not excused; *held*, defendant's prima facie showing not rebutted). If the court determines that the prosecution's presentation is inadequate to rebut the defendant's proof, the court should declare a mistrial and a new jury should be selected from a new panel.

Plainly these principles and procedures require a modification of the way in which the peremptory challenge system works. The modification is required, however, only in those cases in which a defendant makes a prima facie showing that the prosecutor

has used those challenges in a way that is inconsistent with the guarantee of the Sixth Amendment. In any case in which such a showing is not made, the prosecution may exercise its peremptory challenges without any inquiry into their bases. And where the court does inquire, after a prima facie showing has been made, the prosecution need not show cause for the excuse of the jurors in question but only genuine reasons other than group affiliation. We would think the number of occasions in which a defendant would be able to make out a prima facie case that the prosecutor's use of peremptories was systematically excluding a cognizable group from the jury solely on the basis of the group's affiliation would be few; we would hope the number would decrease. In any event, this limited requirement for modification of the traditional, but nonconstitutional, system is a small price to pay for the vindication of a constitutional right.

Nor do we think the necessary procedures place an unreasonable burden on the court. The process of identifying discriminatory conduct and pretextual explanations is performed daily in the course of litigation under Title VII of the Civil Rights Act of 1964 and a host of other statutes. It should not be considered unduly burdensome, in those cases where a prima facie showing has been made, to scrutinize the prosecutor's actions when a defendant's life or liberty may be at stake.

Finally, we note that in states that have ruled that the prosecution's use of its peremptory challenges is subject to scrutiny under the state constitution, we have seen no indication in the reported authorities or the commentaries that the implementation of such scrutiny as has been required has created an undue burden for the prosecution or the courts. In *People v. Hall*, the California Supreme Court declined an invitation to overrule its five-year-old decision in *Wheeler*, stating that it had no empirical evidence that the *Wheeler* procedures had proven unworkable. 197 Cal.Rptr. at 76 & n. 11, 672 P.2d at 859 & n. 11. And in the present case, the State advises us that in

the two years between the decision of the New York Appellate Division in *People v. Thompson,* holding that the racially discriminatory use of peremptories by the prosecutor was invalid under the New York Constitution, and the implicit overruling of that decision by the New York Court of Appeals in *People v. McCray,* the *Thompson* rule did not create any practical problems whatever.

## V. APPLICATION OF SIXTH AMENDMENT ANALYSIS TO THE PRESENT CASE

Application of the foregoing principles to the present case poses two questions: first, whether McCray established a prima facie case; and second, whether the State is entitled to a hearing at which it may present evidence to rebut that case. We answer both questions in the affirmative.

### A. *McCray's Prima Facie Showing*

█ The district court correctly ruled that McCray had made a prima facie showing that the prosecutor exercised the State's peremptory challenges to exclude black and Hispanic jurors on the basis of their group affiliation. McCray's trial counsel objected during the voir dire and detailed the prosecutor's use of the State's challenges, which up to that point had eliminated all of the blacks and Hispanics drawn. He identified several minority venirepersons who were excused despite having proffered no discernible reason to believe that they would not be unbiased jurors, and one black who was excused despite having had an experience that one might think would make him identify more with a complaining witness than with a defendant. McCray's showing was ample to shift to the State the burden of coming forward with some reason other than group affiliation for the challenges.

We are not persuaded to the contrary view by the State's argument that one black venireperson was eventually seated as a jury alternate. Questions of possible tokenism aside, *see, e.g., Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), we note that the selection of that alternate did not occur until after McCray had challenged the prosecutor's use of eight of the State's eleven peremptories to rid the jury of all the blacks and Hispanics called to that point. McCray had established his prima facie case at the time of his first objection to the prosecutor's actions. The trial court should have inquired into the prosecutor's reasons for the use of the State's peremptories against the minority members of the venire and, in the absence of a response showing permissible reasons, a mistrial should have been ordered and the jury selection process begun afresh.

The question that remains is whether the record that now exists warranted the district court's conditional granting of the writ without further proceedings.

### B. *The Need for a Hearing on the State's Proffer of Rebuttal*

The State advances two bases for its argument that even if McCray did make a prima facie showing that the prosecutor exercised the State's peremptories on the basis of race, the district court should not have granted the conditional writ of habeas corpus. First, it argues that the district court should have deferred to the trial court's "decision to credit" the prosecutor's denial that she had so used the State's peremptories. Alternatively, it contends that the district court itself should have held a hearing on the State's proffer of rebutting evidence. We reject the former contention but agree with the latter.

The State's first contention is governed by 28 U.S.C. § 2254(d), which requires the district court to defer to factual findings by the state court only if (1) they are evidenced by reliable written indicia, (2) the court's factfinding procedure was adequate to afford a full and fair hearing, and (3) the findings are fairly supported by the record. Here the district court was not required to accept the State's view that the state trial court made any finding that the prosecutor did not exercise the peremptory challenges impermissibly. The trial court made no

such finding in its written opinion. Nor is such a finding reflected in any transcript or in any other writing in the record.

All that appears in the record is the trial court's statement in its written opinion, published nearly two months after the conduct of the voir dire, that the prosecutor denied having used the State's peremptories discriminatorily. Even that statement, however, is not supported by the record. The transcript of the argument and colloquy that followed McCray's objection to the prosecutor's actions during the voir dire reveals no statement whatever from the prosecutor. Further, it clearly appears from the record that the trial court refused to conduct any sort of hearing. Accordingly, the district court was not required to infer that the state court had found no racially discriminatory use of the peremptory challenges nor even to defer to the trial court's statement that the prosecutor had denied such use.

While the failure of the trial court to inquire into the prosecutor's reasons for the peremptory exclusion of minority venirepersons might well suffice to cause a state appellate court to order a new trial without further proceedings, *see, e.g., People v. Thompson*, 79 A.D.2d 87, 435 N.Y. S.2d 739 (1981), there are circumstances here that suggest that the district court should have held a hearing to conduct an inquiry into those reasons.

First, principles of federalism and comity suggest that a writ of habeas corpus not be granted freeing a state defendant or granting him a new trial without giving the state every opportunity to respond to the petitioner's allegations. Thus, in *Bermudez v. Reid*, 733 F.2d 18 (2d Cir.1984), in which the state had repeatedly defaulted in its obligation to respond to the allegations of the petition, we reversed the district court's granting of the writ on the basis of those defaults. We ruled that the court was required to conduct a hearing into the allegations to determine whether the petitioner could make some factual showing that his federal rights had been violated, and that, notwithstanding the earlier inexcusable de-

faults, the state should be given notice of the hearing in order that the court might consider the petition on the basis of the best available evidence.

We see no basis here for departing from the principle established by *Bermudez*, especially since the State has not defaulted and has urged that it be allowed to present rebutting evidence. We realize that the State did not come forward with an affidavit by the ADA who conducted the McCray trials until after the district court had rendered its decision conditionally granting the writ. But we see no indication that the State intended to default in any way, and it could well have been that the State believed there was no immediate urgency to come forward with a factual showing in light of the uncertainty that the federal constitutional contentions advanced by McCray, which had theretofore been rejected by virtually every other court to consider them, would be accepted, and the fact that McCray himself had requested, if those contentions were accepted, that a hearing be held. Further, we note that the ADA who tried McCray stated in her affidavit to the district court that she had offered to explain to the trial court her reasons for each challenge; that at that time she had notes relating to the voir dire; and that the trial court refused to permit her to present her reasons. While such a proffer by the ADA is nowhere reflected in the record, we do not know that it did not occur.

We recognize that more than four years have elapsed since the conduct of the voir dire in question, and that the State's practical burden of rebutting the prima facie showing made by McCray has increased with the passage of time. Nonetheless, in all the circumstances of this case, we think it appropriate for the district court to conduct a hearing into the State's proffered rebuttal of the prima facie case established by McCray.

CONCLUSION

We agree with the decision of the district court insofar as it ruled that McCray estab-

lished a prima facie case that the State violated his rights under the Sixth Amendment by exercising its peremptory challenges to exclude black and Hispanic prospective jurors on the basis of their group affiliation. The order conditionally granting the writ is vacated and the matter is remanded for further proceedings consistent with this opinion.

MESKILL, Circuit Judge, dissenting:

I respectfully dissent.

Although the majority's effort to combat what it perceives to be a form of discrimination is well intentioned, the result reached is unworkable and contrary to the law of this and almost every other circuit. Until today's decision, federal appellate case law dealing with the racial makeup of juries was uniform; to establish a violation of the Constitution, the defendant had to prove a *systematic exclusion* of blacks from petit juries that extended over a number of cases. Absent such a showing, the objective existence or nonexistence of a "proper" reason for the prosecutor's use of a peremptory challenge was irrelevant because the "presumption in any particular case *must be* that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court." *Swain v. Alabama,* 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965) (emphasis added).[1]

The majority recognizes that *Swain* is the starting point for any analysis of the alleged discriminatory use of peremptory challenges. The teaching of *Swain* is clear. After reviewing the nature and purpose of peremptory challenges and commenting on their importance in our system of justice, the Court stated:

> In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we

cannot hold that *the Constitution* requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it.

380 U.S. at 222, 85 S.Ct. at 837 (emphasis added).

While the majority finds *Swain* distasteful, it concedes that for purposes of McCray's equal protection claim *Swain* is controlling. However, in an attempt to circumvent *Swain,* the majority finds that a string of Sixth Amendment cases opens the door *Swain* so clearly closed. The majority's approach is contrary to the law established in a host of federal appellate court decisions, including the law of this Circuit.

In *United States v. Newman,* 549 F.2d 240 (2d Cir.1977), decided after almost all of the Sixth Amendment cases on which the majority relies, we recognized the continued validity of *Swain.* Although *Newman* involved a due process claim, the Court was cognizant of Sixth Amendment standards, stating that the case before it concerned the defendants' right to "a fair and impartial jury and one which represents a fair cross-section of the community." 549 F.2d at 244. In rejecting the defendants' challenge of the prosecutor's use of peremptory challenges, the Court stated:

1. The majority refers on several occasions to the state's concession that the use of race as a factor in making peremptory challenges violates the Sixth and Fourteenth Amendments. However, the majority recognized that the state's concession of a possible equal protection violation was erroneous. I agree with them on that point, but I also find the state's concession of a possible Sixth Amendment violation to be erroneous. Moreover, given the precedent in this area, I find the state's concession to be incomprehensible from a legal viewpoint.

Nor under the circumstances did the defendants under *any existing law* have the right to inquire into and interrogate the prosecutor about his reasons for peremptorily challenging the four Black veniremen in the jury pool. *Swain v. Alabama, supra,* is the governing authority on this matter.

549 F.2d at 246 (emphasis added).

Moreover, in *United States v. Danzey,* 476 F.Supp. 1065 (E.D.N.Y.1979), a Sixth Amendment claim was brought under facts similar to those in the case before us. Indeed, the prosecutor in *Danzey* admitted: "I make it a practice to attempt to exclude as best I can all jurors ... of the same ethnic background as the defendant." *Id.* at 1066. In rejecting the defendant's Sixth Amendment claim, Judge Nickerson found *Swain* and *Newman* controlling. We affirmed without opinion, 620 F.2d 286 (2d Cir.1980), and in a concurrence in the denial of a petition for a rehearing *en banc,* four members of our Court stated that the "use of peremptory challenges based on a *group bias assumption* denies *no cognizable legal rights* 'in any particular case.'" *United States v. Danzey,* 622 F.2d 1065, 1066 (2d Cir.) (emphasis added, quoting *Swain,* 380 U.S. at 221), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980). They went on to add "no relief is appropriate unless the offending *pattern is sufficiently general and pervasive* to support a clear inference of motivation or intent to discriminate against a particular racial or ethnic group." 622 F.2d at 1066 (emphasis added, citing *Newman,* 549 F.2d at 249–50). The majority should not so lightly disregard our prior decisions.

Even if the law of our Circuit were not clear, the overwhelming weight of authority from other circuits calls for a rejection of the majority's approach. At least five circuits have rejected the notion that the Supreme Court's later Sixth Amendment decisions, particularly *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), have undercut *Swain. United States v. Clark,* 737 F.2d 679, 681–82 (7th Cir.1984) (practical considerations support

prevailing view that *Swain* is still controlling law); *Willis v. Zant,* 720 F.2d 1212, 1219 n. 14 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984) (Sixth Amendment analysis of *Taylor* does not extend to petit juries); *United States v. Whitfield,* 715 F.2d 145, 146–47 (4th Cir.1983) (appellant made Sixth Amendment claim, *Swain* cited as controlling); *United States v. Childress,* 715 F.2d 1313 (8th Cir.1983) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984) (*Taylor's* Sixth Amendment analysis does not overrule *Swain*); *Weathersby v. Morris,* 708 F.2d 1493, 1497 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984) (*Taylor* analysis does not extend to petit juries). Moreover, three other circuits have recently reaffirmed the validity of *Swain,* although it is unclear from their decisions whether Sixth Amendment claims were advanced. *United States v. Canel,* 708 F.2d 894, 898 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 165, 78 L.Ed.2d 151 (1983) ("We decline to change the rule that neither side need justify the use of peremptory challenges."); *United States v. Jenkins,* 701 F.2d 850, 859–60 (10th Cir.1983) (*Swain* called for rejection of appellant's claim which only challenged conduct at his trial); *United States v. Durham,* 587 F.2d 799, 801 (5th Cir.1979) (defendant must show *systematic* exclusion of blacks from petit juries).

The weight of authority against the majority's *Swain*/Sixth Amendment analysis exists for good reason: the Sixth Amendment cases are not inconsistent with *Swain.* Like *Swain,* the Sixth Amendment decisions that involve exclusion of prospective jurors focus on systematic exclusion. *See, e.g., Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (state may not challenge for *cause* potential jurors opposed to death penalty; possibly due process rather than Sixth Amendment grounds); *Taylor v. Louisiana,* 419 U.S. 522, 533, 95 S.Ct. 692, 699, 42 L.Ed.2d 690 (1975) ("women cannot be systematically excluded from jury panels from which petit juries are drawn"); *Duren v. Missou-*

*ri,* 439 U.S. 357, 360, 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979) (the "systematic exclusion of women that results in jury venires averaging less than 15% female violates the Constitution's fair-cross-section requirement").

Moreover, the Sixth Amendment cases do not show a retreat from *Swain.* For example, in *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), on which the majority relies, Justice White stated:

> All that the Constitution forbids, however, is *systematic exclusion* of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been *systematically excluded.* See *Swain v. Alabama,* 380 U.S. 202, 208–209 [85 S.Ct. 824, 829–830, 13 L.Ed.2d 759] (1965) ....

406 U.S. at 413, 92 S.Ct. at 1634 (plurality opinion; emphasis added). In addition, in *Taylor,* the Court made it clear that it imposed

> no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, *Fay v. New York,* 332 U.S. 261, 284 [67 S.Ct. 1613, 1625, 91 L.Ed. 2043] (1947); *Apodaca v. Oregon,* 406 U.S., at 413 [92 S.Ct. at 1634] (plurality opinion); but the *jury wheels, pools of names, panels,* or *venires* from which juries are drawn must not *systematically exclude* distinctive groups in the community and thereby fail to be reasonably representative thereof.

419 U.S. at 538, 95 S.Ct. at 702 (emphasis added). I therefore find the majority's

analysis of the interaction between *Swain* and Sixth Amendment precedent unpersuasive.

Even if we could decide this case in a vacuum, removed from the precedent against the majority's approach, there are a number of practical factors that militate against the majority's decision. First, the majority gives far too little weight to the peremptory challenge's long history as a tool used to ensure an impartial jury.[2] An attorney who uses her challenges to exclude from the jury members of the same race, religion, sex, occupation, class or ethnic background as her opponent's client is not invidiously discriminating against members of that group. Rather, the attorney is trying to ensure that her client faces a jury that at least will be unbiased and at best will be receptive to her view of the case. We must remember that at the same time the defense counsel, who may well have more challenges, is engaged in the same process. The result of this adversarial system should be an impartial jury. As the Supreme Court recognized in *Swain,* the nature of this system means that peremptory challenges are often

> exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be.... Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which

---

**2.** The majority places great emphasis on the absence of a constitutional provision allowing peremptory challenges. While there is no constitutional requirement for peremptory challenges, the challenge is designed to secure an impartial jury, which is the overriding Sixth Amendment objective. The Supreme Court has recognized its importance in holding the per-

emptory challenge to be "a necessary part of trial by jury," *Swain,* 380 U.S. at 219, 85 S.Ct. at 835, and "essential in contemplation of law to the impartiality of the trial," *Lewis,* 146 U.S. at 378, 13 S.Ct. at 139. Thus, I believe that the majority has unduly minimized the significance of the peremptory challenge.

**1138**

may include their group affiliations, in the context of the case to be tried. 380 U.S. at 220–21, 85 S.Ct. at 836 (footnotes omitted).

Although the majority finds such group based assumptions "fallacious" and "pernicious," an attorney has not only a right but an obligation to challenge a prospective juror who *may* be biased, even if the basis of her belief is a broad generalization, which may not in fact be true. Thus, the actual issue in this case is not whether a prosecutor may systematically exclude members of some group from sitting on juries but whether a prosecutor may use peremptory challenges to exclude individual members of a group because she believes that *in that particular case* they *may* be biased in favor of members of the defendant's group.[3] A competent prosecutor will only strike a member of the defendant's group in situations where she believes the possibility of that individual having a group bias—even if very small—is greater than the possibility of some other prospective juror having a bias. Where the group based assumption against members of the defendant's group is outweighed by some other assumption, the prosecutor will turn to the other assumptions; for instance, if a black college student is being tried in a draft registration case, the prosecutor may prefer to challenge a white social worker rather than a black veteran. By banning the use of such assumptions, the majority has severely limited the effectiveness of the peremptory challenge. *See also King*

*v. County of Nassau*, 581 F.Supp. 493, 500–01 (E.D.N.Y.1984).

In addition, the majority fails to confront the obvious implication of its ruling for defense attorneys. As the Seventh Circuit recently recognized, "[i]t would be hard to argue that only a defendant should be allowed to challenge racially motivated peremptory challenges.... As it cannot be right to believe that racial discrimination is wrong only when it harms a criminal defendant, and not when it harms the law abiding community represented by the prosecutor ...." *Clark*, 737 F.2d at 682. *See also Florida v. Neil*, 457 So.2d 481 (Fla.1984) (Alderman, *J.*, dissenting); *Commonwealth v. Soares*, 377 Mass. 461, 489–90 n. 35, 387 N.E.2d 499, 517 n. 35, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler*, 22 Cal.3d 258, 282 n. 29, 148 Cal.Rptr. 890, 907 n. 29, 583 P.2d 748, 765 n. 29 (1978).

This very problem, and the negative impact it will have for defendants, was foreseen in *Newman*.

The right to peremptory challenges is of great importance, both to the Government and to the defendants—but mostly to the defendants, because they are personally involved in the result of the trial and for this reason usually have more of the peremptory challenges than the Government. These challenges provide one of the most effective assurances that a party will have a fair and impartial jury.... Once, however, a plaintiff or prosecutor is required to submit to inter-

---

**3.** At times in its opinion the majority attempts to cast the case before us as one involving systematic exclusion. Indeed, based on the Sixth Amendment guarantee of an impartial jury in "all criminal cases," the majority states that a systematic exclusion may be established in an individual case. Majority Op. at 1130–1131, 1132. I find it difficult to accept its interpretation of systematic. In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Court defined the term systematic in the following passage: "[Petitioners'] undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular

jury-selection process utilized." 439 U.S. at 366, 99 S.Ct. at 669. Thus, to establish systematic exclusion, even in Sixth Amendment cases, the defendant must show case after case exclusion. If in the case before us the defendant could make this showing, *Swain* would outlaw the practice and there would be no need to look to the Sixth Amendment. However, such an analysis does not satisfy the majority because it finds a *Swain* violation too difficult to prove. Thus, it redefines systematic and develops an easier test. What the majority ignores in so doing is that perhaps the reason *Swain* violations have not been proved in an "acceptable" number of cases is that they do not exist in an acceptable number of cases.

rogation concerning his reasons for making a peremptory challenge, it will probably not be long before defendants will be required to do likewise. This, in all likelihood, would spell the end of peremptory challenges; and Blacks and other recognizable minority groups would thereby suffer a major loss in the removal of one of the greatest safeguards the law has provided for a fair trial.

549 F.2d at 250 n. 8.[4]

The majority also fails to confront the virtual limitlessness of its Sixth Amendment analysis. To establish a prima facie case under the majority's standard, the defendant need only show "(1) the group alleged to be excluded is a *cognizable group* in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venireperson's group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented." Majority op. at 1131–32 (emphasis added). Thus, a group based assumption may not be used to exclude a member of any Sixth Amendment "cognizable" or "distinctive group." "Distinctive groups" under the Sixth Amendment are those that "are sufficiently numerous and distinct" that if they are systematically excluded from jury venires, "the Sixth Amendment fair-cross-section requirement cannot be satisfied." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) (quoting *Taylor,* 419 U.S. at 531, 95 S.Ct. at 698). For example, in any given community, people opposed to the death penalty may be a "distinctive group" and thus under the majority's analysis they may not be peremptorily challenged.[5] It also appears that men, women, old people, young people, laborers, professionals, Democrats, Republicans, etc. are distinctive groups. Therefore, no group based assumptions may be used to eliminate any member of these groups. Such a change is not simply "a modification of the way in which the peremptory challenge system works," Majority op. at 1132. It effectively eliminates the peremptory challenge for all but the most frivolous reasons (people who wear gray, smile, or wear contact lenses).

I believe the result the majority reaches spells the end of the peremptory challenge as an effective jury selection tool. Again a return to *Swain* is appropriate. As the Supreme Court stated in *Swain,* the peremptory challenge is by definition "an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Swain,* 380 U.S. at 219, 85 S.Ct. at 835 (quoting *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)). It added: "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *Swain,* 380 U.S. at 220, 85 S.Ct. at 836. The Court concluded by recognizing that once the prosecutor is required to explain her challenge,

---

4. The extension of the majority's restrictions to the defense will create problems. The prosecution will then have every right, for example, to contend that a black defendant may not use his peremptory challenges exclusively against whites. This not only doubles potential delay and requires all attorneys to keep records of who they are challenging and why, it may also mean that a minority defendant will have to challenge some *minority* prospective jurors peremptorily in order to rebut a charge of discrimination. Furthermore, the defense is often entitled to more peremptory challenges than the prosecution is, *see, e.g.,* Fed.R.Crim.P. 24(b). Consequently, in order to avoid an inference of discrimination the defense may be forced to challenge more minority prospective jurors than the prosecution would. This is even more "pernicious" than the result the majority condemns.

5. Such a result is contrary to the holdings of at least two circuits which have considered this issue. *Dobbert v. Strickland,* 718 F.2d 1518, 1524–25 (11th Cir.1983) (although under *Witherspoon* state may not challenge prospective jurors opposed to death penalty for cause, state may peremptorily challenge those prospective jurors); *Jordan v. Watkins,* 681 F.2d 1067, 1070 (5th Cir.1982) (*Witherspoon* inapplicable to situation where prospective juror was peremptorily challenged). Thus, to the extent that the majority relies on *Witherspoon,* Majority Op. at 1129, its result is again contrary to the law of other circuits.

[t]he challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

380 U.S. at 222, 85 S.Ct. at 837.

The continued validity of the Court's concern in *Swain* was recently pointed out by the Seventh Circuit. In expressing its doubt that *Swain* has been undercut by the Sixth Amendment cases, that court recognized the practical considerations that weigh against such an analysis. First among these was "[t]he potential for stretching out criminal trials that are already too long, by making the voir dire a Title VII proceeding in miniature." *Clark*, 737 F.2d at 682. The court also observed that if the prosecutor is faced with having to defend his peremptory challenges,

it is hard to see how the peremptory challenge ... will survive. Whenever counsel alleged that his opponent had a racial or similar type of motivation in exercising a peremptory challenge (whether he used that challenge to exclude a white or a black—and it would have to be one or the other—or, extending the principle as one could hardly resist doing, a man or a woman, a Jew or a gentile, etc.) the opponent would have to come forward with a reason for wanting to exclude the juror. In other words he would have to provide good cause, or something very close to it; and the peremptory challenge would collapse into the challenge for cause.

*Id.*

The majority, however, steadfastly asserts that it is not imposing a cause stan-

dard. However, the line it is attempting to draw is at best gossamery. Moreover, any inquiry into the motivation of the prosecutor entails a tremendous burden. As Judge Wexler recently explained:

Even assuming the existence of a clear theoretical rule regarding what types of peremptory challenges are legal, enormous difficulties would arise from any attempt to implement such a rule in practice. A great deal of time, effort and expense would be necessary to attempt to determine whether any given peremptory challenge is legal. Any such determination would entail the extremely difficult task of assessing the internal motives of the attorneys. It might also require an inquiry by the Court into the ethnic or religious backgrounds of prospective jurors, thereby promoting the very emphasis on such factors which the rule seeks to avoid.... Most important of all, attorneys, confronted with a rule completely or partially restricting their right to act with the internal motive of helping their clients when making peremptory challenges, will be under enormous pressure to lie regarding their motives. Such a rule will foster hypocrisy and disrespect for our system of justice. Indeed, it is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal.

*King v. County of Nassau*, 581 F.Supp. 493, 501–02 (E.D.N.Y.1984) (holding *Swain* is still controlling law).[6]

In sum, the majority reaches its conclusion only by rejecting the overwhelming weight of authority and by minimizing the burdens that its result will place on the court and the litigants. Although it is offended by any *group* based assumptions, it fails to recognize that in a particular case such assumptions are not illogical and may

---

**6.** The majority believes that its prima facie test will be difficult to meet. I find its belief unwarranted. To establish a prima facie case in their case-by-case approach, the defendant will only have to show that members of the distinctive group were repeatedly challenged. Thus, if a venire contains three members of a "cognizable group" and all three are challenged or maybe two of three are challenged, a prima facie case appears to be established. I find it hard to believe that this result will occur in only a "few" cases. Moreover, the impact of the threat of having to justify every challenge will be significant, *see supra* note 4.

weigh heavily with the attorney attempting to select a jury. By acting on these assumptions, the attorney is not invidiously discriminating against members of the group excluded, be they blacks, whites, men, women, Catholics or Jews. Rather the attorney is using his best judgment and acting within an adversarial system designed to create an impartial and unbiased jury, which is, after all, the overriding Sixth Amendment goal. The majority's attempt to fine tune this system, even though well intentioned, is bound to cause more harm than good.

I would vacate the order of the district court granting the petition for a writ of habeas corpus and remand with directions to dismiss the petition.